## TOWN OF BRANFORD *v.* THOMAS SANTA BARBARA, JR., ET AL.
## (SC 18089)

## NEW ENGLAND ESTATES, LLC *v.* TOWN OF BRANFORD
## (SC 18091)

Norcott, Katz, Palmer, Zarella and McLachlan, Js.*

* This case was argued prior to the implementation of the policy of this court to hear all cases en banc.

Argued May 26, 2009—officially released February 16, 2010

*Wesley W. Horton*, with whom were *William H. Clendenen, Jr., Kimberly A. Knox* and, on the brief, *Kevin C. Shea, Kenneth J. Bartschi, David A. Reif, Matthew A. Weiner* and *Jonathan M. Freiman*, for the appellant (defendant town of Branford).

*Timothy S. Hollister*, with whom were *Sheila A. Huddleston* and, on the brief, *Jill O'Toole*, for the appellee (plaintiff New England Estates, LLC).

*Linda L. Morkan*, with whom, on the brief, were *Steven R. Humphrey, Brian R. Smith* and *Jeffrey J. White*, for the appellees (plaintiffs Thomas Santa Barbara, Jr., et al.).

McLACHLAN, J. These two consolidated appeals,[1] as well as the two companion cases also decided today; see *Branford* v. *Santa Barbara*, 294 Conn. 803, 988 A.2d 221 (2010); *New England Estates, LLC* v. *Branford*, 294 Conn. 817, 988 A.2d 229 (2010); arise from the exercise of eminent domain by the defendant town of Branford (town), with respect to an approximately seventy-seven acre parcel of land, known as 48-86 Tabor Drive, in the south central area of town. The town appeals from the judgments of the trial court in favor of the plaintiffs,

[1] On August 16, 2007, the town of Branford filed two separate appeals from the judgments of the trial court to the Appellate Court. Subsequently, we transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1, and granted a motion by Thomas Santa Barbara, Jr., Frank Perrotti, Jr., and New England Estates, LLC, to consolidate the appeals.

Thomas Santa Barbara, Jr., and Frank Perrotti, Jr., the owners of the subject property at the time of the taking (owners), and the plaintiff, New England Estates, LLC (New England Estates), a developer that had entered into an option contract with the owners to purchase the property.[2] The town claims that the trial court improperly concluded that the highest and best use of the property was for residential development. The town bases this claim primarily on the contention that, in order for the trial court to so conclude, it first must have concluded that New England Estates would have prevailed in an appeal pursuant to General Statutes § 8-30g from the decision of the town planning and zoning commission (zoning commission) denying its application for site plan approval, and that such a conclusion would have been improper.[3] Additionally, the town

[2] In the first case, the town filed a certificate of taking and the owners subsequently sought review of the statement of compensation. In addition to the owners, the first case also included the following parties: National Railroad Passenger Corporation, Adelbert Mautte, Dorothy Mautte, Dennis Butler, Barbara Butler, Barbara Kennedy, the town sewer authority, Edward Parzyck and Mary Brown.

In the second case, New England Estates sought review of the statement of compensation filed by the town. Thereafter, the trial court consolidated the appeals challenging the statement of compensation. Although the first case is captioned *Town of Branford v. Thomas Santa Barbara, Jr., et al.*, because the town filed the certificate of taking, "[t]his court has recognized that the filing of a statement of compensation does not originate a civil action. *Simmons v. State*, 160 Conn. 492, 494 n.1, 280 A.2d 352 (1971)." *Branford v. Santa Barbara*, supra, 294 Conn. 811 n.10. Consequently, we recognize the town as the defendant and New England Estates and the owners as the plaintiffs in these appeals. We refer to these parties by name, however, rather than by party status, in order to avoid any confusion that may result from any contrary identification by the parties in certain pleadings at the trial level.

[3] The town also argues that, because neither the owners nor New England Estates appealed from the zoning commission's denial of the application for site plan approval to develop the property as affordable housing, each of them waived their right to argue that they would have prevailed in such an appeal. Because we conclude that the question of whether New England Estates would have prevailed in an appeal pursuant to § 8-30g is not necessary to the resolution of the present appeals, it is unnecessary for us to resolve whether either of them waived their right to argue that they would

claims that the trial court improperly allowed New England Estates' expert witness to testify regarding his opinion that on appeal the trial court would have reversed the denial of New England Estates' affordable housing application. We affirm the judgments of the trial court.

The trial court found the following relevant facts. The property consists of 76.91 acres, and residential development is the predominant use of the land surrounding the property. The property is bordered on the west by Tabor Drive, along which are residences, a church, a cemetery, salt marshes and small industrial sites. The property is bordered on the north by an active railroad line, which separates the property from residential neighborhoods to the north. The northeastern corner of the property abuts Pine Orchard Road. A landfill borders the property on the southwest, and land owned by the Branford Land Trust makes up the remainder of the southern border of the property. To the east are a dog kennel, a veterinary clinic and more residential neighborhoods. The property is about one mile southeast of the town center and is southeast of the Branford River. Long Island Sound is about three quarters of a mile to the south of the property.

Because the site formerly had been mined for sand and gravel, much of the topsoil has been removed. Wetlands comprise 7.35 acres of the property, including a 4.7 acre pond. Although the northwest portion of the site is within a flood plain, according to a flood insurance rate map dated June 16, 1992, and November 18, 1983, a majority of that portion of the property is located in an area of minimal flooding. Dirt and gravel roads run through the site, and sewer, water, electricity and

have prevailed in an appeal from the denial of the application for site plan approval. Moreover, the town's taking of the land rendered any such appeals moot.

telephone service are available to the property. At the time of the taking in January, 2004, most of the site was zoned IG-2 industrial, and a small portion was zoned R-3 residential.[4] There also was a special development area[5] overlay zone over the entire site. The property previously had been designated a planned development district, but the town had eliminated that designation for the property in 2002 pursuant to § 35.11 of the town zoning regulations.[6]

---

[4] Chapter II, § 23.12, of the Branford zoning regulations defines IG-2, or "[g]eneral [i]ndustrial [d]istrict #2" as follows: "These districts consist of areas intended to be used for heavy commercial and industrial development on a less intensive basis than the [general industrial district #1] [d]istricts. They are designed for occupancy on somewhat larger sites with more spacious setbacks, in order to assure a high quality of development within the [d]istrict and an agreeable relationship to adjacent districts. Further development of retail, business and residential uses in these districts will be inconsistent with their purpose and the purpose of the districts. Any residential construction would occur under conditions unfavorable for residential occupancy."

Chapter II, § 23.4, of the Branford zoning regulations defines a "[r]esidence R-3 [d]istrict" as follows: "These districts are designed to consist of single family houses on lots of sufficient size to support private sewage disposal systems pending extension of sewers. Institutions and similar uses will be necessary and appropriate in these districts but only as special uses upon a finding that development will be compatible with the character of the district."

[5] Chapter II, § 23.15, of the Branford zoning regulations defines "[s]pecial [d]evelopment [a]rea" as an overlay zoning district that is "in addition to and overlap[ping] one or more other districts for the purpose of defining that area of [t]own in which other districts, including [p]lanned [d]evelopment [d]istricts, may be established and coordinated in accordance with overall plans for development of the area."

[6] Chapter III, § 35, of the Branford zoning regulations governs planned development districts, which may be established only within the special development area designated on the town zoning map. Once a planned development district is authorized by the zoning commission, "[t]he development authorized by the [c]ommission shall be completed within five . . . years from the effective date of the [d]istrict, except that the [c]ommission may extend the time for completion for one . . . year periods after public hearing for good cause demonstrated to the satisfaction of the [c]ommission; otherwise the [c]ommission shall be deemed authorized by the owner or owners of land within the [d]istrict to amend these [r]egulations and the [z]oning [m]ap, deleting the [p]lanned [d]evelopment [d]istrict and establish-

In 1988, notwithstanding the zoning classification of the property as IG-2 industrial, the town had approved a site plan application for the construction of a development on the property consisting of 298 residential condominiums, a community building and a nine hole golf course. In the early 1990's, the owners purchased the property at a foreclosure auction for $2.11 million, and in 2001, entered into an option agreement with New England Estates for a purchase price of $4.75 million. New England Estates, which had been formed for the purpose of purchasing and developing the property, agreed to pay $10,000 per month for the option to purchase, as well as the costs of testing, engineering, site designs, and town approvals for the proposed residential development, including legal fees associated with the approval process. The contract allowed for renewal periods at higher monthly rates, and subsequent amendments allowed New England Estates to extend the term of the option agreement. The contract provided for an additional payment at closing of $100,000, plus $45,000 per revised renewal period.

After entering into the option agreement, New England Estates began its efforts to secure site plan approval for a residential development on the property. Initially intending to resurrect the 1988 plan, it hired the same engineering, planning and landscaping firm that had prepared that plan. Ultimately, New England Estates submitted a plan for a 268 unit development with a golf course. The town's inland wetlands commission and the United States Army Corps of Engineers both granted permits for the site plan, in May, 2002, and March, 2003, respectively. The zoning commission, however, denied New England Estates' application

ing for such land the provisions of another zoning district." Branford Zoning Regs., c. III, § 35.11.

seeking a new planned development district designation for the property.[7]

In May, 2003, New England Estates submitted a new plan, this time under the affordable housing statute. See General Statutes § 8-30g. The plan called for 354 units, but did not include a golf course. At the same time, New England Estates sought a modification to the permit it had received from the inland wetlands commission in 2002, for the 268 unit proposed development. In June, 2003, New England Estates once again submitted a site plan application for a 354 unit affordable housing development, this time including a golf course. In August, 2003, the inland wetlands commission informed New England Estates that it would not consider a modification of the 2002 inland wetlands permit, and that an application for a new permit was required.[8]

In July, 2003, the representative town meeting, the town's legislative body, voted to take the property by eminent domain, and on December 18, 2003, the town filed a notice of condemnation and statement of compensation in the amount of $1,167,800. That sum was deposited with the clerk of the court. In the meantime, the zoning commission conducted public hearings on New England Estates' June, 2003 proposed site plan and § 8-30g application. The town acquired the site by eminent domain on January 5, 2004, and subsequently denied New England Estates' § 8-30g application. In separate actions, the owners and New England Estates each filed appeals and applications for review of the statement of compensation. The two actions were consolidated and transferred to the complex litigation docket in the judicial district of Waterbury, where they

---

[7] New England Estates appealed the denial to the Superior Court, but later withdrew the appeal.

[8] New England Estates appealed the decision of the inland wetlands commission, but later withdrew the appeal.

were tried together before the court.[9] The judgments in those cases give rise to these appeals.

The trial court heard the testimony of two appraisers on behalf of the owners and New England Estates, R. Bruce Hunter and Richard A. Michaud, and one appraiser on behalf of the town, Albert W. Franke III. Hunter and Michaud, both of whom testified that it was reasonably probable that New England Estates' would obtain approval for residential development of the property, began with the premise that the highest and best use of the land was residential, while Franke, who concluded that such approval was "highly speculative at best," began with the assumption that the highest and best use was for the land to remain vacant and undeveloped.[10] Hunter, relying on the sales comparison approach,[11] determined that the market value of the land was $6.1 million based on the 354 unit affordable housing development proposal, and $6.2 million based on the 268 unit market rate housing development proposal. Michaud relied on both the sales comparison approach and the development approach,[12] and arrived

[9] Prior to trial, the owners filed an offer of judgment pursuant to General Statutes § 52-192a, for the amount of $3,967,800. The town objected to the offer of judgment, contending that § 52-192a is inapplicable to condemnation cases. In a memorandum of decision issued on September 20, 2005, the trial court, *Blue, J.*, agreed with the town and sustained the objection. The owners have appealed that decision in *Branford* v. *Santa Barbara*, supra, 294 Conn. 806, which was released on the same date as this opinion.

[10] Franke agreed with the other experts that the property was not suited, despite its IG-2 zoning classification, for industrial use, stating that there is a weak market for industrial development of parcels of this size, and that the property had poor accessibility for truck traffic.

[11] The sales comparison approach, also known as the market data approach or the comparable sales approach, "is a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property being appraised. . . . After identifying comparable sales, the appraiser makes adjustments to the sales prices based on elements of comparison." (Internal quotation marks omitted.) *Abington, LLC* v. *Avon*, 101 Conn. App. 709, 711–12 n.4, 922 A.2d 1148 (2007).

[12] The development approach is a type of income capitalization approach for appraising property, specifically adapted to the valuation of "multiple

at a valuation of $6.9 million under the sales comparison approach and a valuation of approximately $6.4 million under the development approach. Giving slightly greater weight to the development approach, Michaud arrived at a final valuation of $6.5 million. Franke relied on the sales comparison approach to arrive at a valuation of $770,000.

The trial court found that the highest and best use of the land was residential, and, accordingly, rejected Franke's opinion. The court relied on the appraisals of Hunter and Michaud, as well as all of the testimony presented during the trial and the court's visual inspection of the property, to arrive at a valuation of $4.6 million.[13] In arriving at its conclusion, the court specifically found that the town had presented no credible evidence of environmental contamination of the site. These appeals followed.

I

The town first claims that the trial court improperly determined that the highest and best use of the property

unimproved lots in a subdivision or potential subdivision as a unit." *Lehigh-Northampton Airport Authority* v. *Fuller*, 862 A.2d 159, 167 (Pa. Commw. 2004), cert. denied, 2005 Pa. LEXIS 3158 (December 29, 2005). "The income capitalization approach consists of the following seven steps: (1) estimate gross income; (2) estimate vacancy and collection loss; (3) calculate effective gross income (i.e., deduct vacancy and collection loss from estimated gross income); (4) estimate fixed and operating expenses and reserves for replacement of short-lived items; (5) estimate net income (i.e., deduct expenses from effective gross income); (6) select an applicable capitalization rate; and (7) apply the capitalization rate to net income to arrive at an indication of the market value of the property being appraised. . . . The process is based on the principle that the amount of net income a property can produce is related to its market value." (Internal quotation marks omitted.) *Housing Authority* v. *CB Alexander Real Estate, LLC*, 107 Conn. App. 167, 170 n.6, 944 A.2d 1010 (2008).

[13] The court also awarded the owners and New England Estates interest of 4 percent per annum on $3,432,200, the amount by which the award exceeded the amount that the town had deposited with the clerk of the court when it filed its statement of compensation.

was for residential development. The town argues that because the property was zoned industrial at the time of the taking, New England Estates could not have secured approval for a residential development without a zone change. Because it was not reasonably probable that New England Estates would have been successful in obtaining a zone change, the town argues, the trial court's conclusion that the highest and best use of the property was residential was improper. We disagree that the appeal turns on whether New England Estates successfully would have obtained a zone change. Instead, because there were sufficient facts in the record independent of that issue to support the trial court's finding that the highest and best use of the land is residential, we conclude that the court's determination was not clearly erroneous.

"The owner of land taken by condemnation is entitled to be paid just compensation. Conn. Const., art. I, § 11." *Lynch* v. *West Hartford*, 167 Conn. 67, 73, 355 A.2d 42 (1974). "[T]he amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking." (Internal quotation marks omitted.) *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 256 Conn. 813, 828, 776 A.2d 1068 (2001). "Generally speaking, market value is the price that would in all probability—the probability being based upon the evidence in the case—result from fair negotiations, where the seller is willing to sell and the buyer desires to buy." (Internal quotation marks omitted.) *Budney* v. *Ives*, 156 Conn. 83, 88, 239 A.2d 482 (1968). "The highest and best use concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate. . . . In determining its highest and best use, the [trier]

must consider whether there was a reasonable probability that the subject property would be put to that use in the reasonably near future, and what effect such a prospective use may have had on the property's market value at the time of the taking." (Citations omitted; internal quotation marks omitted.) *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 829.

"Because a change in zoning restrictions obviously could affect the price of real property, where such a change is reasonably probable and not merely a remote or speculative possibility, the probability may properly be considered in the determination of the fair value of the property." (Internal quotation marks omitted.) *Greene* v. *Burns*, 221 Conn. 736, 745, 607 A.2d 402 (1992). In determining the market value of a property in light of a reasonably probable zone change, "the true issue is . . . the value of the property as zoned at the time of the taking as it is affected by the probability of a change." *Budney* v. *Ives*, supra, 156 Conn. 89. The questions of the highest and best use of the property and the reasonable probability of a zone change are questions of fact, and a trial court's determination of these issues will not be disturbed unless clearly erroneous. *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 65, 931 A.2d 237 (2007); *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 375, 525 A.2d 68 (1987).

In reviewing the factual findings of the trial court under the highly deferential, clearly erroneous standard of review, "[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence in the record to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *St. Joseph's Living Center, Inc.* v. *Windham*, 290 Conn. 695, 706–707, 966 A.2d 188 (2009).

Implicit in the trial court's finding that the highest and best use of the land is residential is the finding that it was reasonably probable that New England Estates would succeed in obtaining approval to use the land for residential development under at least one of the proposed development plans—either the 354 unit affordable housing development or the 268 unit market rate development—and that it was also reasonably probable that New England Estates successfully would obtain any necessary zone changes.[14] The trial court had more than sufficient evidence before it to support

[14] New England Estates contends that a zone change would not be necessary in order for the property to be approved for use as a residential development because: (1) the town's zoning regulations allow some residential uses in an IG-2 industrial zone; see footnote 4 of this opinion; (2) the special development area overlay applicable to the property would permit the designation of a planned development district pursuant to chapter III, § 35.1, of the Branford zoning regulations, which in turn would allow the land to be used for residential development without any zone change; and (3) the prior, 1988 approval was accomplished without a zone change. The town contends that the town's zoning regulations prohibit residential development in an IG-2 industrial zone. The town also points to the fact that New England Estates' site plan application sought the creation of a new "[h]ousing [o]pportunity [d]istrict," in the town's zoning regulations, and the designation of the property as a housing opportunity district. Lastly, in response to New England Estates' contention that the creation of a planned development district would not require a zone change, the town points out that the creation of a planned development district results in the modification of the zoning regulations. See Branford Zoning Regs., c. III, § 35.6 (upon establishment of planned development district, "these [z]oning [r]egulations and the [z]oning [m]ap shall be considered to be modified to permit the establishment of the development as approved").

We need not decide whether a zone change was required to develop the land residentially. Instead, we read the trial court's memorandum of decision to include an implicit determination that, if a zone change was required, it was reasonably probable that New England Estates would have obtained one.

those implicit factual findings. The court's memorandum of decision recognizes that at the time of the taking, the property was zoned as IG-2 industrial under the town's zoning regulations. The court noted, however, that in 1988, when the property also was zoned as IG-2 industrial, the town approved a proposal for a 298 unit condominium development that would have included a community building and a nine hole golf course.[15] The court considered the following additional facts: The property was located within a special development area, and previously had been designated a planned development district. As part of the town's plan of conservation and development, adopted in 1997, the town's future land use map designated most of the property for use as moderate to high density residential development. In May, 2002, New England Estates received a permit from the town's inland wetlands commission for its proposal for a 268 unit condominium development

[15] We recognize that on July 24, 2003, the zoning commission voted to amend the town zoning regulations, amending the town's plan of conservation and development to remove from the future land use map the designation of the property as intended for moderate/high density residential use to office/industrial use and amending the IG-2 classification by changing the letting of rooms within that classification from a permitted use to a prohibited use. New England Estates' application, however, was filed in June, 2003. Accordingly, the zoning regulations that were in effect at the date of the application apply. See General Statutes § 8-2h (a) ("[a]n application filed with a zoning commission, planning and zoning commission, zoning board of appeals or agency exercising zoning authority of a town, city or borough which is in conformance with the applicable zoning regulations as of the time of filing shall not be required to comply with, nor shall it be disapproved for the reason that it does not comply with, any change in the zoning regulations or the boundaries of zoning districts of such town, city or borough taking effect after the filing of such application").

Although the town correctly states that land is valued as it is zoned at the time of the taking; see *Budney* v. *Ives*, supra, 156 Conn. 89; the factual circumstances of the present case—particularly the timing of the changes to the zoning regulations in relation to New England Estates' June, 2003 site plan application for an affordable housing development and in relation to the date of the taking—persuade us that the property should be valued as it was zoned at the time of the June, 2003 application. See *New England Estates, LLC* v. *Branford*, supra, 294 Conn. 824–28.

with a nine hole golf course. In March, 2003, in connection with the same proposed development, New England Estates received a permit under 33 U.S.C. § 1344 from the United States Army Corps of Engineers.[16]

The court also found that the property's location is an "ideal setting for residential use," located close to both Long Island Sound and the town center, with considerable frontage on the existing streets of Tabor Drive and Pine Orchard Road. There are residential neighborhoods to the north, east and west of the property. The property has easy access to utilities, including a sanitary sewer line and a municipal water line. Two of the three experts who testified at trial stated their opinion that it was reasonably probable that New England Estates would be successful in obtaining approval for a residential development on the property.[17] New England

---

[16] Section 1344 (a) of title 33 of the United States Code, known as the Clean Water Act, authorizes the secretary of the army, acting through the army chief of engineers, to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites. . . ."

[17] The town contends that the testimony of the two experts—Hunter and Michaud—is not probative, and instead constitutes mere conjecture. The town cites to *Tandet* v. *Urban Redevelopment Commission*, 179 Conn. 293, 299, 426 A.2d 280 (1979), for the proposition that: "Where in the opinion of the appraiser the property is not, on the date of taking, being put to its highest and best use, it is incumbent upon the appraiser to provide the trier with sufficient evidence from which it could conclude that it is reasonably probable that the land to be taken would, but for the taking, be devoted to the proposed use by a prudent investor in the near future." First, we note that we did not state in *Tandet* that the evidence testified to by the experts must in isolation support a trial court's determination that there is a reasonable probability that a property would be put to its highest and best use. On the contrary, the court was entitled to consider the testimony of Hunter and Michaud in the context of *all* the evidence presented at trial relevant to the proposed use of the property, and, as we have explained in this opinion, there was sufficient evidence in the record to support the conclusion that there was a reasonable probability that the property would have been put to residential use but for the taking. Second, we note that both experts testified as to the basis for their conclusion that it was reasonably probable that New England Estates would obtain the necessary approvals. Specifically, Hunter testified that it was a reasonable assumption that either of the

Estates had entered into an option agreement with the owners, which the trial court recounted in great detail. That agreement established a purchase price of $4.75 million, required New England Estates to pay tens of thousands of dollars monthly for the option, and also required that New England Estates pay the costs of obtaining the necessary approvals for the development. New England Estates diligently sought such approval, filing three separate site plan applications for residential development of the property. The court also relied on its own visual inspection of the property. Finally, the court found that there was no credible evidence to support the primary reason proffered by the town—that the property was environmentally contaminated—for rejecting the development plan submitted by New England Estates.[18]

The evidence amply supports the trial court's express determination that the highest and best use of the property was residential, and its implicit determination that it was reasonably probable that New England Estates would obtain the necessary approvals for a residential development, including any necessary zoning changes. We find particularly significant the prior approvals by

proposed developments—both the 268 unit market rate development and the 354 unit affordable housing development—would have been approved. He based his opinion primarily on the 1988 approval of the 298 unit development proposal, which, he observed, went through with no change in the zoning regulations. Michaud had based his appraisal only on the 354 unit affordable housing development proposal, and testified that, based on his general knowledge of affordable housing applications, it was a reasonable assumption that the development ultimately would be approved. The trial court properly could consider the testimony of the experts as to the probability that the property would be put to use as residential, and evaluate the credibility of that testimony in light of the basis for those opinions, in the context of all of the relevant evidence.

[18] In making this finding, the court noted that it had precluded the testimony of the town's expert on the issue of environmental contamination on the basis of the town's failure to disclose the expert within a reasonable time prior to trial. See Practice Book § 13-4. The town does not challenge in these appeals the court's decision to preclude the expert testimony.

both the town inland wetlands commission and the zoning commission of a similar development plan in 1988, prepared by the same engineering, planning and landscaping firm, under the same applicable zoning restrictions. Those prior 1988 approvals, coupled with the designation of the property on the future land use map as intended for moderate to high density residential use, the 2002 inland wetlands commission approval, the 2003 approval by the United States Army Corps of Engineers, the opinions of the two experts relied upon by the court, the fact that the property's location is ideally suited for residential development, and the fact that the trial court did not find credible the town's proffered reason for denial of approval for the June, 2003 development plan—that the property was environmentally contaminated—all combine to provide more than enough support for the trial court's findings. We conclude, therefore, that the court's determination that the highest and best use of the land was for residential development, and its underlying, implicit determination that New England Estates would have obtained the necessary approvals and any necessary zoning changes were not clearly erroneous.

The town argues that, in order to affirm the trial court, we must conclude that New England Estates would have prevailed in an appeal pursuant to § 8-30g of the zoning commission's denial of New England Estates' site plan application for the affordable housing development. We disagree. Put most simply, the trial court did not address this issue, and, because there was sufficient, other evidence to support the trial court's finding, it did not need to resolve the question in order to decide the case.

As we have stated, in reviewing the court's findings for clear error, "we focus on the conclusion of the trial court, as well as *the method by which it arrived at that conclusion,* to determine whether it is legally correct

and factually supported." (Emphasis added; internal quotation marks omitted.) *St. Joseph's Living Center, Inc.* v. *Windham,* supra, 290 Conn. 707. It is unnecessary to consider whether a method *not* relied upon by the trial court—namely, a determination of whether New England Estates would have prevailed in an appeal pursuant to § 8-30g—would have had merit. In concluding that it was reasonably probable that New England Estates would have obtained approval for residential development of the property, the court relied on the testimony of experts, evidence of a previous similar approval, the characteristics of the property that render it suitable for residential development, the town's development plan and its own visual inspection of the land. In resolving these appeals, we are required to decide whether the trial court's determination was clearly erroneous based on the record presented. The trial court did *not* rely, in arriving at its determination of highest and best use, on a conclusion that New England Estates would have been required to prevail in an appeal pursuant to § 8-30g, and would have so prevailed. Moreover, the court did not base its valuation on a specific finding that the property would be developed as an affordable housing development. Rather, it based its valuation at least in part on the testimony of Hunter, who appraised the property based both on the 268 unit market rate development and the 354 unit affordable housing development. Because the record is devoid of evidence that the court based its decision on an evaluation of the merits of an appeal by New England Estates pursuant to § 8-30g, and because there is ample evidence to support the court's determination, it is unnecessary for us to determine whether New England Estates would have prevailed in a § 8-30g appeal.

II

The town next claims that the trial court improperly allowed Mark K. Branse, an attorney who testified as

New England Estates' zoning law expert witness, to offer his opinion that the trial court would have reversed the denial of New England Estates' affordable housing application. We disagree.

Branse testified that it was his opinion that the reasons offered by the zoning commission in denying New England Estates' application would have been insufficient to withstand a challenge in the Superior Court pursuant to § 8-30g. The town objected that the testimony was inappropriate because it constituted an interpretation of the law, and was testimony as to the ultimate issue in the case. The court overruled the objection. Because we already have concluded in this opinion that the question of whether New England Estates would have prevailed in an appeal of the decision of the zoning commission pursuant to § 8-30g is irrelevant to the resolution of this appeal, it hardly can be said that Branse offered testimony as to the ultimate issue in the case. Similarly, even if the testimony was improperly admitted on the basis that it constituted impermissible legal opinion because the record is devoid of evidence that the court grounded its decision on the likelihood of a successful appeal pursuant to § 8-30g, any error was harmless.

The judgments are affirmed.

In this opinion the other justices concurred.

---

* This case was argued prior to the implementation of the policy of this court to hear all cases en banc.