449 P.2d 945

Henry L. MOSCHETTI, Appellant,

v.

The CITY OF TUCSON, a municipal
corporation, Appellee.

No. 2 CA–CIV 552.

Court of Appeals of Arizona.

Jan. 17, 1969.

Rehearing Denied March 12, 1969.

Review Denied April 15, 1969.

Dunseath, Stubbs & Burch, by Robert C. Stubbs, Tucson, for appellant.

Dino DeConcini, City Atty., Tucson, Stanley G. Feldman, Tucson, Special Counsel for City of Tucson, and James C. Carruth, Tucson, for appellee.

MOLLOY, Chief Judge.

The critical issue in this eminent domain proceeding is whether the trial judge properly refused to permit expert testimony offered by the owner of residential property bordering on a major urban artery concerning the probability of a future rezoning of the land to include commercial uses, and the effect of the prospect of such

a rezoning on the market value of the land at the time of taking.

Appellant owns two adjacent lots, irregularly shaped, each having 177 feet of frontage on the south side of Broadway Boulevard in the City of Tucson. There is a house on one lot; the other is vacant. The depth of the lots varies from 160 to 260 feet. The appellee, City of Tucson, commenced this action to condemn the northerly 20 feet of appellant's land for the purpose of widening Broadway from four lanes to six lanes. The date of the taking was September 6, 1966.

Appellant's two lots are located along the north edge of a subdivision known as Colonia Solana, which is one of the most desirable residential areas in the city. Deed restrictions applicable to appellant's lots, and nearly all of the other lots within Colonia Solana, limit use of the land to single family residences. These deed restrictions expire in 1978. All of the lots so restricted have been zoned "R–1" by the City of Tucson, the designated classification for single family residences.

Broadway is one of the two most heavily traveled thoroughfares in Tucson. It extends from the central business district on the west side of the city to the rapidly developing and predominantly residential east side. It was estimated that some 30,000 cars pass by appellant's land daily. The El Con shopping center, the largest in Tucson outside of the central business district, is located on the north side of Broadway some 900 feet east of appellant's land. Colonia Solana is bordered on the west side by Country Club Drive, which is located three lots west of appellant's land. From Country Club Drive to the heart of the central business district, a distance of some three miles, the land bordering both sides of Broadway is largely zoned and used for commercial purposes. There is, in addition to the El Con shopping center, considerable commercial development along parts of Broadway for several miles east of appellant's land. No new residences have been built on land adjoining Broadway

for several miles on either side of appellant's land since 1956. The record discloses a considerable number of instances in which residential land bordering on Broadway has been rezoned to permit its use for commercial purposes.

In 1959, Tucson city officials adopted a "Master Plan for the City of Tucson," prepared in conjunction with Pima County, by a joint City-County Planning Department. Included in the Master Plan is a "General Land Use Plan," for the City of Tucson and its environs. The latter is a projected and generalized scheme for the balanced and orderly development of the city, in which land is allocated to various uses. While it does not have the force of law, as does the present zoning ordinance, it is to be used as a guide for future zoning changes. On a map of projected uses contained within the General Land Use Plan, appellant's land is classified as commercial, and the land just east of appellant's, within Colonia Solana, is classified for multiple residential and "other transitional" uses.

Appellant's theory in presenting his case was that the highest and best use of his land was for commercial purposes. Appellant sought to introduce testimony, through his expert appraiser, that a rezoning of this land to permit commercial uses was probable at least after the expiration date of the deed restrictions in 1978. Then, based upon that testimony, appellant sought to have his appraiser testify as to what a willing purchaser would pay for the land at the time of taking, giving a discounted effect to the probability that the land would be rezoned after the termination of the deed restrictions.

The appellee-city's theory was that the highest and best use of the land was for residential purposes, and that, in view of the deed restrictions, as well as the present zoning classification, any use of the land for commercial purposes was too remote and speculative to be taken into consideration. Appellee's expert appraiser did, however, admit making the following statement

in a report to the city on the property under consideration:

"However, anyone interested in this portion of Broadway is aware of the fact that restrictions in Colonia Solana expire in 1978 and that the restrictions in [the subdivision north of Broadway] * * * expire in 1979. It appears from the market that purchases have been made in anticipation of the expiration of the restrictions and a possible rezoning and that long-time property owners are continuing to hold their property as the dates of restriction expiration near."

The trial judge excluded the evidence offered by appellants, and held that they were confined to proving what the lots were worth for residential purposes, plus any premium that they could show as to commercial potential by sales of comparable residential property along Broadway. The case was tried on that basis, over appellant's strenuous objections. The jury returned a verdict awarding $2,500 for the lot on which the house was located, and $2,000 for the vacant lot. The figures were very close to the city appraiser's evaluation of the land taken, which was the lowest evaluation in evidence.

Appellant preliminarily contends that the deed restrictions were not admissible in evidence. The general tenor of the argument is that the deed restrictions were placed on the land to benefit Colonia Solana landowners, and not the city, and that their existence should not result in a reduction of the amount of compensation payable upon an involuntary taking of property. It is argued that only the Colonia Solana landowners had the right to enforce the restrictions, for their own benefit, and that consideration of the deed restrictions in a condemnation proceeding grants a "windfall" to the condemnor.

■ While the argument has some force, we find ourselves in disagreement with appellant on this matter. Speaking generally, the availability of land for a prohibited use cannot be considered in determining its value in a condemnation pro-

ceeding. See, e. g., Gear v. City of Phoenix, 93 Ariz. 260, 263, 379 P.2d 972, 974 (1963). Private restrictions such as the deed restrictions in this case and public zoning restrictions on the same land are separately and independently enforceable in our courts. Murphey v. Gray, 84 Ariz. 299, 304, 327 P. 2d 751, 754 (1958). The restrictions are enforceable on their face, and having acquired the land subject thereto, appellant is not in a position to insist that his land be valued as if the restrictions did not exist.

■ We find distinguishable situations in which the land sought to be condemned is part of a tract devoted to more specifically limited purposes, such as land held for a certain charitable purpose. See, in that connection, In re Appropriation of Easement for Highway Pur., 169 Ohio St. 291, 159 N.E.2d 612, 75 A.L.R.2d 1373 (1959), and the annotation commencing at 75 A.L.R.2d 1382. There are, on the other hand, authorities holding that private residential restrictions, similar to those involved in the present case, are to be considered in evaluating land to be taken by condemnation. Staninger v. Jacksonville Expressway Authority, Fla.App., 182 So. 2d 483, 22 A.L.R.3d 950 (1966); State v. Reece, 374 S.W.2d 686 (Tex.Civ.App.1964); and see the annotation at 22 A.L.R.3d 961. We think their ruling on that question is sound.

■ In so holding, however, we do not mean to say that a condemnee is foreclosed from presenting evidence to the effect that the restrictions have been so disregarded· as to be unenforceable, or that they are unenforceable for some other reason, or even that there is a likelihood that the owners of all of the land affected by the restrictions will take collective action effective to nullify the restrictions. It is at least conceivable that, in a proper case, the court might find private use restrictions unenforceable as a matter of law, thus allowing the trier of fact to consider the value of the land without regard to such restrictions. See, in this regard, the

concurring opinion in Staninger v. Jacksonville Expressway Authority, supra.

In this case, however, there was no evidence presented tending to show that the deed restrictions were not enforceable or that they would not be enforced. We believe the trial judge was justified in concluding that an effective rezoning of the land and its use for commercial purposes was not possible until 1978.

However, this does not mean that the future of this land after 1978 has no place in this lawsuit. It is easy to understand how the trial judge arrived at a conclusion that the proffered testimony of appellant's appraiser was inadmissible. One of the most frequently cited statements of the pertinent law on this subject is found in 4 Nichols on Eminent Domain § 12.322 [1], at 238–243 (3d ed. 1962), reading as follows:

"Where the enactment of the zoning restriction is not predicated upon the inherent evil of the proscribed use—in other words, where the forbidden use is *malum prohibitum* rather than *malum in se*—and there is a possibility or probability that the zoning restriction may *in the near future* be repealed or amended so as to permit the use in question, such likelihood may be considered if the prospect of such repeal or amendment is sufficiently likely as to have an appreciable influence upon present market value. It follows from the foregoing that such possible change in the zoning regulations must not be remote or speculative." (Textual emphasis added.)

Most of the jurisdictions which have considered the question have adopted some or all of the substance of the foregoing rule, including our own Supreme Court in the case of State ex rel. Morrison v. McMinn, 88 Ariz. 261, 355 P.2d 900 (1960). Most of the decisions have given emphasis to the requirement that the prospective change in zoning be "reasonably probable" within "the near future" or probable within a "reasonable time." See cases cited in Nichols, id.; and see Annot., 9 A.L.R.3d

291, at 309–312. An example of the result of this emphasis is found in the case of City of Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808 (Supreme Court of Texas 1954), where the court stated the following test for admissibility of evidence of a prospective change in zoning:

"If the trial judge is satisfied from the evidence as a whole that there is no reasonable probability that existing restrictions may be lifted within a reasonable time, he should exclude evidence of value based on use for any purposes other than those to which it is restricted. On the other hand, if it appears reasonably probable to the trial judge that the wants and needs of the particular community may result, within a reasonable time, in the lifting of restrictions, he should admit testimony of present value based on prospective use of the property for purposes not then available." 267 S.W.2d 815.

Obviously, we can have no quarrel with the broad rule quoted from Nichols, supra, which is in general accord with the decision of our Supreme Court in State v. McMinn, supra. Nor do we disagree with the quoted passage in the *Cannizzo* case, as far as it goes. But, insofar as a rigid adherence to either rule requires that there be a probability of rezoning "in the near future," we do not think that it provides for just compensation to an owner in a case like this one.

The term "in the near future" or even the term "in a reasonable time" bear no direct relationship to the ultimate subject under inquiry, i. e., the market value of the condemnee's land to the hypothetical willing buyer. To a literal-minded judge, the term "near future" might exclude a rezoning that is unlikely for a two or three year period. To an astute investor, however, ten, fifteen or even twenty years might be considered "in the near future," or a "reasonable time," from the standpoint of investment objectives. One primary objective in a condemnation proceeding is to bring the values of the real-world market-

place into the courtroom. Yet a rule which commands a trial judge to exclude evidence of a rezoning which may take place beyond the judge's abstract notion of the "near future" or a "reasonable time" seems to us to frustrate that goal.

 The far better rule, in our view, emphasizes the clause in the Nichols rule which states that " * * * such likelihood may be considered if the prospect of such [zoning change] * * * is sufficiently likely as to have an appreciable influence upon present market value." We find support for this conclusion in the case of Wolff v. Commonwealth of Puerto Rico, 341 F.2d 945 (1st Cir. 1965), where the court, while quoting the rule set forth in Nichols which we have set out, stated the following rule in footnote 3, at 341 F.2d 946:

> "The test, of course, is not either possibly [*sic*] or probability of re-zoning in absolute terms, but the fair market value of the locus in the light of the chances as they would appear to the hypothetical willing buyer and seller. While some of the cases cited infra speak only in terms of probability, *we think that any possibility sufficiently substantial to affect market value must be regarded.*" (Emphasis added.)

 We think that the "market effect" principle suggested in the *Wolff* case, and in that portion of the Nichols rule to which we would give emphasis, is the crux of the test to be applied. The ultimate inquiry in any condemnation case is the market value of the condemnee's land. Evidence which has a material bearing on market value should be admissible, without regard to whether it relates to an eventuality that might or might not occur in the "near" or more "distant" future, as long as the prospect of the event has substantial present influence on market value. It seems to us that the real purpose of the "near future" and anti-"remote or speculative" qualifications of the rule stated in Nichols is to exclude consideration of an asserted prospective rezoning which is nothing much

more than a figment of a bullish owner's imagination.

 We are reluctant to overrule the trial court in an area which necessarily calls for the exercise of the trial judge's discretion. Yet, when the stated test is applied to the present case, we think it clear that the testimony offered by appellants should have been admitted. All of the circumstances combine to indicate a probability of rezoning and commercial use of this property when the deed restrictions expire in the year 1978.

We comment on matters which may arise on retrial. Following testimony on the part of a city employee that the widening project would commence when "federal funds" became available, counsel for the City elicited testimony from the witness to the effect that only funds of the City of Tucson would be used to pay the condemnation award to appellant. This latter procedure is assigned as error.

 Generally, it is improper to elicit testimony as to the source of funds to be used to pay a condemnation award. See Children's Home, Inc. v. State Highway Board, 125 Vt. 93, 211 A.2d 257, 19 A.L.R.3d 681 (1965), and Annot., 19 A.L.R. 3d 694. However, we believe the testimony introduced here was permissible to set the record straight. The erroneous testimony pertaining to the "federal funds" was elicited by cross-examination of appellant's counsel. Granted that the answer was nonresponsive, the general rule is that only the interrogating counsel has the right to object on this grounds. United States v. Schneiderman, 106 F.Supp. 892, 905 (S.D. Calif. 1952), and authorities cited therein; McCord v. Strader, 227 Ind. 389, 86 N.E.2d 441, 443 (1949); 98 C.J.S. Witnesses § 353, at 77; McCormick, Evidence § 52, n. 6, at 116 (Hornbrook Series 1954). By failing to move to strike this non-responsive testimony, the interrogating counsel in effect injected this irrelevant evidence into the record, and, it being prejudicial to the opposing party, the opposing party had the right to rebut it. See McCormick, Evidence

§ 57, at 132–134, and Franklin Fire Ins. Co. v. Coleman, 87 S.W.2d 537, 538 (Tex.Civ. App.1935).

Error is also charged in that the City elicited from this witness testimony that appellant's land would not be specially assessed 'for the widening of Broadway. Appellant, citing City of Eugene v. Wiley, 225 Or. 327, 358 P.2d 286 (1960), urges that the testimony was prejudicially inadmissible. The *City of Eugene* case, supra, was cited noncommittally by this court in City of Tucson v. LaForge, 8 Ariz.App. 413, 446 P.2d 692, 697 (1968). The Oregon decision holds that reversible error was committed when "[t]he judge instructed the jury to consider the proposed assessment as a burden upon defendants' property and that it was a proper element of damages." 358 P.2d 287. *City of Eugene* relies upon Application of City of Lincoln, 161 Neb. 680, 74 N.W.2d 470 (1956). The *City of Lincoln* opinion appears to hold both that it was error to permit the introduction of testimony of special assessments to be assessed against the property not taken and that it was error to instruct the jury that it should consider such future assessments as an element of damages. 74 N.W.2d 471.

█ We take no quarrel with these decisions insofar as they determine that special assessments, as such, are not "an element of damages." This seems to be the universally accepted law. See 4 Nichols on Eminent Domain § 14.248 [1], at 689. But insofar as these decisions do not recognize that the existence or nonexistence of a special assessment on land remaining after a portion has been taken by eminent domain is admissible in evidence for such bearing as it has upon the "after" value of property, we disagree.

█ In this state, when a portion of a larger parcel is taken by eminent domain, the statutory test to determine severance damage is:

"* * * the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned, *and*

*the construction of the improvement in the manner proposed by the plaintiff.*" (Emphasis added.) A.R.S. § 12–1122, subsec. A(2).

In a jurisdiction enforcing this standard, it is inescapable that the benefit conferred upon the remaining land by the improvements contemplated will reduce severance damage.

█ We appreciate that there are complex and, for this jurisdiction at least, largely unresolved questions of how and when to instruct a jury on "special" as opposed to "general" benefits. See Phoenix Title and Trust Company v. State ex rel. Herman, 5 Ariz.App. 246, 425 P.2d 434 (1967). See also State Highway Commission v. Bailey, 212 Or. 261, 319 P.2d 906 (1957); 3 Nichols, Eminent Domain, §§ 8.6201–8.6203, at 60 et seq.; Annot., 13 A. L.R.3d 1149–1160 et seq. But, regardless of what instruction is given on the subject of "general" benefits, the fact finder is required under our law to evaluate the "after" value of the remaining property as opposed to its "before" value. See State ex rel. Herman v. Tucson Title Insurance Company, 101 Ariz. 415, 416, 420 P.2d 286 (1966); State ex rel. Morrison v. Thelberg, 87 Ariz. 318, 325, 350 P.2d 988 (1960). These evaluations will not be made in a theoretical vacuum, but in a theoretical marketplace, in which the value of the remaining property will necessarily be affected both by the influence of the proposed improvements upon the remainder and by the improvement assessment encumbering that remainder.

█ If the landowner is to have some or all of the enhancement in value resulting from the improvement deducted from his severance damage, and then is to be assessed specially for this same, or overlapping, benefit, then the landowner has not received the "just compensation" to which our Constitution entitles him. Ariz. Const. art. 2, § 17, 1 A.R.S.

The *City of Lincoln* decision assumes that the owner has been "* * * fully compensated * * *" for the damage

suffered to the remaining land by reason of the taking when this special assessment to be imposed upon that remaining land is excluded from the consideration of the fact finder. 74 N.W.2d 472. In our view, this assumption is only correct in a jurisdiction in which the fact finder is instructed that it is to consider and award damages for any possible future use of the condemned property without regard to any benefits from the improvement proposed. This may have been our law previous to *Thelberg*. In re Forsstrom, 44 Ariz. 472, 38 P. 2d 878 (1934); and see Pima County v. Bilby, 87 Ariz. 366, 351 P.2d 647 (1960), *explaining the change in our law*. But when the property owner's award is to be limited to the damages resulting from the improvements immediately contemplated by the condemning authority, then there is no basis to assume that full compensation has been made to the property owner regardless of what assessments are placed upon the remaining property in order to construct those improvements.

We need only postulate two partial condemnations, with identical lands and identical improvements involved. One condemnation is to result in a special assessment of $10,000, and, in the other, the landowner is to get the improvements without cost, as in the instant case. We believe that fundamentals of justice demand that the one property owner be compensated on a somewhat different basis from the other. It does not necessarily mean, of course, that the difference in damage in this hypothetical case will be $10,000. We are testing values in the marketplace, and it is easily understandable that the amount of an assessment might not pro rata reduce the value of property, in view of the favorable interest rate usually obtained through public improvement bonding and the liberal terms of payment. However, for whatever value the information regarding the improvement assessment may have in assisting the fact finder in determining the "after" value of the remaining property, we believe that it is admissible for this purpose. The view we take here must

probably be characterized as "minority," but the following authorities, which appear to still be the law of the respective jurisdictions, reason as we do. City of Philadelphia v. Crew-Levick Co., 278 Pa. 218, 122 A. 300 (1923); Albertson v. City of Philadelphia, 185 Pa. 223, 39 A. 887 (1898); Reyenthaler v. City of Philadelphia, 160 Pa. 195, 28 A. 840 (1894); Schuler v. Board of Sup'rs., 12 S.D. 460, 81 N.W. 890 (1900).

■ If it is relevant to establish the amount of an assessment which is to be placed upon remaining property in order to assist the jury in determining severance damage, then we believe it is equally proper to establish that in the particular case no such assessment is contemplated. For this reason, we see no error in the admission of the subject testimony.

■ We are also of the opinion that it was permissible for the City's attorney to cross-examine the appellant's appraiser with regard to earlier sales of nearby property, even though these sales took place in 1953 and 1956. In cross-examining an expert, we believe that the field of inquiry is somewhat greater than that allowed in introducing comparable sales on direct examination. Questioning the expert on these earlier sales is one means of testing the appraiser's expertise as to the subject property, and we see no error in permitting, in the discretion of the trial court, this cross-examination. Youngblood v. Austin, 102 Ariz. 74, 77, 424 P.2d 824, 827 (1967); State v. 0.0673 Acres of Land, 224 A.2d 598 (Del.1966).

■ The trial court did not permit appellant's counsel to cross-examine the City's appraiser by reference to the allocations of land set forth in the General Land Use Plan to which we have earlier made reference. The City's appraiser had testified that "only God" knew what would happen to appellant's land after the expiration of the residential restrictions in 1978. We have held that the probability of a rezoning of appellant's land is a proper subject of evidence in this case, and use of the Gen-

eral Land Use Plan was at least permissible for cross-examination purposes. The question of admissibility of the various components of the Master Plan offered into evidence by appellant as substantive evidence has not been placed before us.

In his closing argument, counsel for the City stated that it was the duty of the jury to "safeguard public funds." The argument was not reported and we do not know the precise context in which the statement was made. The trial judge instructed the jury to disregard that portion of counsel's argument. We agree that, in some contexts, argument in such terms might be less than proper, since it is the overriding duty of the jury in a condemnation case to award just compensation to the condemnee. Ariz.Const. art. 2, § 17. Counsel is not, of course, foreclosed from pointing out the correlative nature of the term "just compensation."

Judgment reversed and remanded for a new trial.

HATHAWAY and KRUCKER, JJ., concur.

Rehearing denied; Hathaway, J., dissenting.