McDONALD, J.
**203 *409 The plaintiff, the city of Hartford, exercised its power of eminent domain to take certain property owned by three defendants[1] to advance the city's redevelopment plan that included the construction of a minor league baseball stadium in close proximity to the defendants' property. The defendants, believing that the compensation offered by the city did not account for the increased value and prospects for their property due to the planned ballpark, appealed from the statement of compensation filed by the city. The trial court sustained the appeal, increasing the amount of compensation by approximately $3 million and ordering the city to pay interest at the rate of 7.22 percent. The city appeals from that judgment, claiming that the trial court (1) improperly valued the property on the basis of an unreasonable assumption that the defendants would assemble their parcels with adjoining properties owned by the city for commercial development, and (2) exceeded its authority under General Statutes § 37-3c in its award of interest. We disagree with the city's first claim but agree with its second claim.
The record reveals the following facts, found by the trial court or otherwise undisputed. The property is located in an area north of the downtown area of the city (north downtown) and is comprised of fourteen tax lots that form three distinct parcels, each of irregular shape and covering only part of a city block (collectively, property). For purposes of this case, the property has been designated as Parcels A, B, and C.[2] Parcel A **204 is located directly across from the Dunkin Donuts Park minor league baseball stadium (ballpark) on Main Street, constructed after the taking at issue. Parcel B is located two blocks south of the ballpark on the corner of Ann Uccello and Chapel Streets. Parcel C is located diagonally across from the ballpark on the corner of Main and Pleasant Streets. Collectively, the property is 2.89 acres. Prior to the taking, the three parcels were being used as parking lots. The parcels are situated in areas of north downtown that were zoned as either B-1 or B-2, the most permissive zoning categories in the city, permitting commercial and multifamily uses.
North downtown, due to its separation from the core downtown area by Interstate 84 (I-84), has historically become a separate entity from the downtown. It largely did not benefit from increased commercial development that took place starting in the late 1990s that transformed and reenergized the core downtown. Prior to and continuing through the time of the taking, north downtown contained many rundown and/or abandoned buildings and lots, as well as large, disintegrating parking areas leased by businesses on the south side of I-84 for their employees' use.
*410 Starting in 2003, the city undertook a series of efforts aimed at changing the fortunes of north downtown. In 2003 and 2004, it constructed or renovated several buildings in that area, including a Public Safety Complex, the Hartford police headquarters, and the Capitol Preparatory Magnet School. By early 2009, city officials approved a 2008 redevelopment plan with the stated goal of creating an opportunity for educational, commercial, and residential development in north downtown. The property was included in the area designated for such development. The plan called for the acquisition of properties by purchase, or eminent domain if necessary, to accomplish its development goals. In furtherance of these goals, in 2010, the city acquired a **205 parcel of land adjoining one side of Parcel A and demolished an eyesore building on it commonly known as the "Butt Ugly" building (Ugly lot). The city acquired other properties in the area, but definitive redevelopment plans had not yet materialized.
In July, 2012, a financially distressed seller sold the property under a single deed for approximately $374,000 to the defendant CBV Parking Hartford, LLC, a subsidiary of CBV Parking Holding, LLC (CBV). The sale was not an arm's-length transaction, and the sale price was well under the city's valuation for purposes of property tax assessment.
Pennock J. Yeatman, the sole owner of CBV, is an experienced investor and developer of real estate. Prior to the purchase of the property, Yeatman had reviewed the city's 2008 plan and researched any impediment to redevelopment of the property. After he obtained the property, Yeatman took several steps to facilitate the sale or redevelopment of the property. He divided the property into three parcels to make the option of individual sales readily available, executing conveyances so that each of the three defendant subsidiaries of CBV held one. See footnote 1 of this opinion. He also negotiated the elimination of "gangway" rights or easements,[3] which he viewed as a potential obstacle to assemblage of the property with adjoining properties. CBV's business plan identified the city as "the logical buyer" for Parcel A, viewing the asset as a "long-term assemblage" with adjoining properties owned by the city for a single lot for redevelopment.
By late 2012, the city had become the owner of both of the two smaller properties that adjoined Parcel A: a LAZ parking lot on one side of Parcel A that the city had purchased in October, 2012, for $1,280,000, and the **206 Ugly lot on the other side of Parcel A that it previously had acquired and razed for a total cost of $1,225,000.
In May, 2013, the city offered to buy Parcels A, B, and C for $1,170,000. CBV rejected the offer, indicating that the property was considerably more valuable and that CBV had no financial or other pressures requiring immediate sale. Negotiations continued with offers and counteroffers.
In the meantime and unbeknownst to CBV, the city had decided that the construction of a ballpark could be the catalyst for further redevelopment in north downtown. On July 1, 2014, the city solicited proposals for a public/private partnership for both the construction of the ballpark and the mixed-use development of its environs, including the property.
By the close of the August 1, 2014 deadline for submissions, the city had received three proposals. It selected the one prepared *411 by DoNo Hartford, LLC (DoNo), in collaboration with two other entities. DoNo's proposal presented a concept plan for a " 'dynamic new neighborhood' " for north downtown that included the ballpark, retail businesses, restaurants, and 600 residential units. Under the proposal, Parcels A, B, and C were to be assembled with adjoining properties for mixed-use development. The proposal indicated that DoNo had secured letters of interest for the construction of a grocery store and a brewery with a rooftop beer garden. DoNo supported its proposal with a market study, which concluded: " 'Given the current dynamics between employment, the state of housing opportunities in outlying areas of Hartford, and the tremendous opportunity for placemaking around the ballpark, the necessary conditions are in place to redefine what it means to live downtown.... The subject site represents an opportunity to develop and deliver a [mixed-use **207 ] neighborhood at the exact inflection point of downtown redevelopment.' "
Neither CBV nor Yeatman submitted a proposal, and the city did not solicit one from either. Yeatman claimed to have learned about the ballpark proposal from a Hartford Courant newspaper article published in July, 2014, and the request for development proposals sometime thereafter. According to Yeatman, the one month submission deadline was unusually short by industry standards, and he had inadequate time to complete a proper proposal for submission.[4]
In August, 2014, the city's Court of Common Council approved a resolution authorizing the purchase of the property for $2.5 million, a price to which the parties had previously tentatively agreed. However, in light of the changing landscape, Yeatman countered with a proposal to sell only Parcel A to the city, which would allow the city to assemble the entire block immediately across the street from the ballpark but would allow Yeatman to develop Parcels B and C himself. The city rejected this offer.
In November, 2014, the city exercised its power of eminent domain to take the entire property, filing a statement of compensation of $1,980,000 for the taking. The defendants appealed to the Superior Court, claiming that the amount of compensation was "inadequate." In a trial to the court, both the city and the defendants each presented two appraisals and supporting expert testimony; all of the appraisals were based on a comparable sales methodology.
**208 The city's appraisals valued the property at the time of the taking at $1,900,000 and $2,010,000, respectively. Both appraisals assumed continuation of the property's present use as parking lots. The court concluded that both appraisals suffered from the same "astounding shortcoming"; neither took into account the "major change" of the announced ballpark and expectations for surrounding development.
The defendants' appraisals, prepared by Michaud Company (Michaud) and J.F. Mulready Company, LLC (Mulready), valued the property at $4,810,000 and $5,220,000, respectively. The court rejected the higher Mulready appraisal, which was premised on research related to the effect that new minor league ballparks had on surrounding land values in three other cities, two in North Carolina and one in *412 Indiana. The court found that Mulready's assumption that the positive effects of those developments would similarly follow in Hartford, despite current difficulties remaining in Hartford, was "much too enthusiastic ...." It also concluded that "the research ... does not support the singularly successful picture" reflected in Mulready's valuation.
The court found the Michaud appraisal of $4,810,000 the "most persuasive." The court set forth the following reasons. That appraisal rejected the "as is" approach of the city's appraisals because they did not reflect the highest and best use of the property. The Michaud appraisal also took into account the " 'cloud' " of the city's eminent domain power, which could dissuade competitive buyers and in turn depress value. Significantly, with regard to highest and best use, the court noted: "The Michaud report relies on the concept of 'assemblage,'[5] contemplating that the LAZ property and **209 the Ugly [lot] would be joined with the Main Street exposure of the ... property. Indeed, that is exactly the basis on which DoNo premised its proposal. CBV could have made this assemblage, but was not afforded the opportunity to do so. The Michaud analysis concludes that it was reasonably probable that the property would be assembled, and if the city did not take the parcel, the market would respond. CBV could have developed this property. CBV could have developed Parcels B and C, with the city obtaining [Parcel] A. CBV could have purchased the LAZ and Ugly lots. One of the things that the Mulready findings underscore is that this scenario is exactly what occurred in the three cities studied by Mulready." Finally, the court pointed to the per square foot price that the city had paid for the two lots adjacent to Parcel A before the ballpark was announced, which, if applied to the property, would have yielded a valuation of $3,245,298 or $5,339,933.[6] In conclusion, the court sustained the defendants' appeal, holding that the fair market value of the property at the time of the taking was $4,810,000.
Approximately two weeks after the court issued its decision, upon the defendants' motion, the court awarded interest at a rate of 7.22 percent. The city appealed from the trial court's judgment to the Appellate Court, and we thereafter transferred the appeal to this court. See General Statutes § 51-199 (c) ;
**210 Practice Book § 65-1. On appeal, the city challenges both the amount of compensation and the rate at which the trial court awarded interest.
I
The city claims that the court improperly valued the property on the basis of an unreasonable assumption that the defendants would assemble the property with adjoining properties owned by the city for commercial development. In response, the defendants contend that the city's appeal is moot because it challenges only one of *413 two independent grounds that support the trial court's fair market value determination. Alternatively, they contend that, if the appeal is not dismissed as moot, the city cannot prevail on the merits because the trial court's assemblage valuation was proper.
A
"Mootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve." (Internal quotation marks omitted.) Burbank v. Board of Education , 299 Conn. 833, 839, 11 A.3d 658 (2011). Undoubtedly, if there exists an unchallenged, independent ground to support a decision, an appeal from that decision would be moot, as this court could not afford practical relief even if the appellant were to prevail on the issue raised on appeal. See, e.g., Middlebury v. Connecticut Siting Council , 326 Conn. 40, 54, 161 A.3d 537 (2017) ; Doe v. Hartford Roman Catholic Diocesan Corp. , 317 Conn. 357, 379 n.23, 119 A.3d 462 (2015). We are not persuaded that such circumstances exist in the present case.
The defendants contend that the trial court's valuation rested on an alternative ground that was not based on assemblage. They rely on the final paragraph of the trial court's analysis, which commences with the following sentence: "The history of the city's taking of **211 the two properties adjoining Parcel A of the subject property is enlightening for purposes of this court's evaluation and presents a basis for valuing the property even without application of the assemblage doctrine ." (Emphasis added.) The remainder of the paragraph then explains that applying the per square foot prices paid by the city for the two parcels adjacent to Parcel A to the property would have yielded valuations of $3,245,298 or $5,339,933.
Although the trial court's initial statement clearly lends support to the defendants' view, the paragraph viewed in its entirety and in context persuades us otherwise. The trial court did not adopt either of the two per square foot valuations cited, or even the mean of the two ($4,292,615.50). It did not indicate that it had weighted one of those valuations more heavily than the other, and the valuation ultimately adopted does not conform to any obvious mathematical formula. Nor did the court articulate any reason to settle on a figure closer to the valuation of one adjacent parcel than the other. Instead, adopting the defendants' view, the trial court would have had to settle on the mean of the two valuations, and added the seemingly arbitrary figure of $517,384.50 to coincidentally arrive at the exact same valuation as Michaud's valuation of $4,810,000-a valuation predicated on assemblage.
We recognize that the trial court can make an independent determination of value and fair compensation in light of all the circumstances and is not bound by the valuations or valuation methods used by the appraisers. See, e.g., Bristol v. Tilcon Minerals, Inc. , 284 Conn. 55, 74-75, 931 A.2d 237 (2007) ; Robinson v. Westport , 222 Conn. 402, 410, 610 A.2d 611 (1992). Nonetheless, we decline to presume, in the absence of clearer evidence, that the trial court arbitrarily settled on a valuation. Accordingly, while it also is not an entirely satisfying interpretation of the final paragraph of the court's analysis, **212 the better interpretation is that the court referenced the per square foot valuations to bolster its conclusion that Michaud's valuation, predicated on assemblage, was sound. Therefore, the city's appeal challenging that valuation is not moot.
B
The question before us, therefore, is whether the trial court's adoption of Michaud's valuation was proper. The city's argument is twofold. First, it contends that *414 the trial court applied the wrong legal test because, when it assumed that the defendants would assemble the property with neighboring properties owned by the city for commercial development, it failed to consider whether assemblage would have occurred in the absence of condemnation. Second, it contends that the evidence would not support a conclusion that the proper test was met. We do not agree with either contention.
The governing principles are not in dispute. The government must pay "just compensation" when it takes private property. U.S. Const., amend. V ; accord Conn. Const., art. I, § 11. "The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking.... The highest and best use of a given parcel contemplates the use which will most likely produce the highest market value, greatest financial return, or the most profit ...." (Citation omitted; internal quotation marks omitted.) Commissioner of Transportation v. Towpath Associates , 255 Conn. 529, 540, 767 A.2d 1169 (2001) ( Towpath ).
"Evidence of the special adaptability of land for a particular purpose is properly admitted if there is a reasonable probability that the land could be so used within a reasonable time and with economic feasibility.... A landowner must provide the trier with sufficient **213 evidence from which it could conclude that it is reasonably probable that the land to be taken would, but for the taking, be devoted to the proposed use by a prudent investor in the near future.... The uses to be considered must be so reasonably probable as to have an effect on the present market value of the land. Purely imaginative or speculative value should not be considered." (Citations omitted; internal quotation marks omitted.) Id., at 544, 767 A.2d 1169 ; accord Bristol v. Tilcon Minerals, Inc. , supra, 284 Conn. at 64-65, 931 A.2d 237 ; Northeast Ct. Economic Alliance, Inc. v. ATC Partnership , 256 Conn. 813, 828-29, 776 A.2d 1068 (2001).
Similarly, "[t]he doctrine of assemblage applies when the highest and best use of separate parcels involves their integrated use with lands of another. Pursuant to this doctrine, such prospective use may be properly considered in fixing the value of the property if the joinder of the parcels is reasonably practicable. If applicable, this doctrine allows a property owner to introduce evidence showing that the fair market value of the owner's real estate is enhanced by its probable assemblage with other parcels." 4 J. Sackman, Nichols on Eminent Domain (3d Ed. Rev. 2018) § 13.01 [17].
"[If] combination of the parcels is reasonably probable , then evidence concerning assemblage, and, ultimately, a finding that the land is specially adaptable for that highest and best use, may be appropriate.... [T]he use of property in conjunction with other parcels may affect value if it is shown that such an integrated use reasonably would have occurred in the absence of the condemnation ." (Citation omitted; emphasis added; internal quotation marks omitted.) Towpath , supra, 255 Conn. at 549-50, 767 A.2d 1169.
"[A]lthough the possibility of a change ... always exists in some degree, it [is often] difficult to prove that such a possibility has become a reasonable probability **214 .... Because of the uncertainties necessarily attending the determination of the probability of the happening of such an event in the future, claims and evidence regarding the probability must be scrutinized with care and examined with caution." (Citation omitted; internal quotation marks omitted.) Id., at 551, 767 A.2d 1169.
The trier of fact's determinations as to what is the highest and best use of *415 the property and whether there is a reasonable probability of a future change affecting value are questions of fact. Bristol v. Tilcon Minerals, Inc. , supra, 284 Conn. at 64-65, 931 A.2d 237 ; Greene v. Burns , 221 Conn. 736, 748, 607 A.2d 402 (1992). As such, we do not disturb the trial court's findings on these matters unless they are clearly erroneous. Bristol v. Tilcon Minerals, Inc. , supra, at 65, 931 A.2d 237 ; Robinson v. Westport , supra, 222 Conn. at 414, 610 A.2d 611.
The city's first line of attack, however, is that the trial court's findings as to these matters were made without consideration of a critical element, namely, whether assemblage of the property with parcels owned by the city reasonably would have occurred "in the absence of the condemnation." Towpath , supra, 255 Conn. at 550, 767 A.2d 1169. Whether the trial court applied the proper legal standard is subject to plenary review on appeal. See, e.g., St. Joseph's High School, Inc. v. Planning & Zoning Commission , 176 Conn. App. 570, 586-87, 170 A.3d 73 (2017) ; Norwich v. Styx Investors in Norwich, LLC , 92 Conn. App. 801, 808, 887 A.2d 910 (2006).
We are not persuaded that the trial court failed to apply the proper standard. The city places too much weight on the fact that the trial court did not recite the talismanic phrase "in the absence of condemnation" when reciting the governing law. The trial court repeatedly cited our decision in Towpath , supra, 255 Conn. at 548-50, 767 A.2d 1169, which unambiguously sets forth this requirement. The trial court implicitly acknowledged this requirement when citing its reasons for finding the **215 Michaud valuation persuasive: "The Michaud analysis concludes that it was reasonably probable that the property would be assembled, and if the city did not take the parcel, the market would respond ." (Emphasis added.) This statement is sufficient to warrant application of the presumption that the trial court applied the proper legal standard. See DeNunzio v. DeNunzio , 320 Conn. 178, 197, 128 A.3d 901 (2016) ("[w]hen examining an ambiguous decision ... we presume that the trial court applied the correct standard" [internal quotation marks omitted] ); Singhaviroj v. Board of Education , 301 Conn. 1, 17 n.12, 17 A.3d 1013 (2011) (noting presumption and appellant's failure to seek articulation); see, e.g., Greene v. Burns , supra, 221 Conn. at 746-47, 607 A.2d 402. To the extent that the city's view of the legal standard is colored by its concern as to the propriety of the trial court's ultimate finding of fact that this standard was met, that is a separate matter.
Before we examine the trial court's ultimate finding-that there was a reasonable probability of assemblage for redevelopment by an entity other than the city-it is important to make two clarifications as to the scope of the matter before us. First, the trial court's decision appears to support the defendants' view that the lion's share of the difference between Michaud's valuation and those of the city's experts arises not from assemblage but from the effect on surrounding property values of the city's plan to construct a ballpark. The city's arguments on appeal, however, are exclusively directed to the matter of assemblage.[7] Accordingly, we have no **216 occasion in this opinion to consider *416 whether a principle articulated by some other jurisdictions, namely, that the fair market value of property taken shall not include any increase (or decrease) in the value attributable to a redevelopment project for which the property is taken, has any application to the present circumstances.[8] **217 Second, it is apparent that, throughout these proceedings, the parties and the trial court operated under the assumption that the doctrine of assemblage applies irrespective of whether the properties at issue are under common ownership. In Towpath , this court recognized that there is a split of authority among other jurisdictions on this question but found it unnecessary to adopt a position on that issue because it had not been raised by the parties.[9] *417 Towpath , supra, 255 Conn. at 549 n.13, 767 A.2d 1169 (expressly leaving question open); see also J. Sackman, supra, § 13.01 [17]. As the parties to the present case similarly have not raised this issue, we proceed under the same assumption for purposes of resolving the issues in this appeal.
Having clarified our focus in the present case, we now examine the record to ascertain whether, and to what extent, it supports the trial court's ultimate finding-that assemblage of the property with the city's properties for redevelopment by someone other than the city was reasonably probable. The city does not contend that there was no evidence to support this finding but, rather, seeks to overturn the trial court's judgment on the extraordinary standard that review of the record should engender a "definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.)
**218 Levine v. Sterling , 300 Conn. 521, 535, 16 A.3d 664 (2011) ; see id. (citing alternative tests for ascertaining clear error). Specifically, the city contends that the trial court's reliance on assemblage rested on three pillars that mirrored the valuation that this court deemed improper in Towpath : (1) the assemblage premise for DoNo's proposal; (2) Michaud's analysis; and (3) the defendants' purported ability to assemble and develop the properties. We disagree.
In Towpath , the Department of Transportation exercised the state's power of eminent domain to take properties on opposite sides of a river containing the remnants of stone bridge abutments in order to bridge the river as part of a project to realign and improve a highway. See Towpath , supra, 255 Conn. at 530-31, 533, 767 A.2d 1169. In the defendant property owners' appeal to the Superior Court, the property owners' expert opined that the highest and best use of the property was the use proposed by the state, a bridge site connecting the bridge abutments. Id., at 536, 767 A.2d 1169. The department's expert opined that the highest and best use of both properties was their current use as "vacant/flood zone land," assigning no value to the bridge abutments. Id., at 537, 767 A.2d 1169. The trial court agreed with the valuation proposed by the property owners. Id., at 538, 767 A.2d 1169.
On appeal to this court, the department contended that the trial court improperly failed to apply the general rule "that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings." (Internal quotation marks omitted.) Id., at 539, 767 A.2d 1169. The department further contended that, "because the land was held by separate owners and because anyone wanting to build a bridge would have had to connect the parcels, the trial court engaged in improper speculation in awarding compensation for their special adaptability as a bridge site." Id.
This court concluded that the record did not support the trial court's determination that it was reasonably **219 probable that someone other than the department would have assembled these properties in the near future to construct a bridge thereon. Id., at 547-48, 767 A.2d 1169. The only evidence regarding that scenario came from the defendants' expert, who simply asserted that the abutments could be connected to create either a bike path and/or a walking path to facilitate recreation, and that such projects had been undertaken by public or private entities in other towns. Id., at 546, 767 A.2d 1169. The court concluded that the record failed to provide an adequate foundation to support a finding that it was anything other than " 'imaginative *418 or speculative' that another entity would have acquired these two parcels in the near future to pursue a bridge project." Id., at 548, 767 A.2d 1169. The court further noted that, "although not a conclusive factor, it is undisputed that neither [defendant property owner] had utilized the properties as proposed for their highest and best use; nor did they submit any plans that they, or anyone else, had for using the properties in such a way had the department not condemned the properties for its highway project." Id., at 552, 767 A.2d 1169.
There are material differences between Towpath and the present case that compel a different result. We acknowledge that the defendants' expert witness, Richard A. Michaud of the Michaud Company, was not asked to elaborate on the basis of his opinion that it was reasonably probable that the market would have responded to assemble the property for redevelopment if the city had not taken the property.[10] He did testify unequivocally, however, that the ballpark would have sparked market interest in developing this property. This testimony was consistent with the findings in his report, which examined market conditions existing in Hartford at the time of the taking (retail, residential, **220 office) and the effect that the ballpark would have on those conditions. More important, unlike in Towpath , other support for this opinion existed in the record, on which the trial court was entitled to rely. See Branford v. Santa Barbara , 294 Conn. 785, 799 n.17, 988 A.2d 209 (2010) ("[W]e did not state in [a prior case] that the evidence testified to by the experts must in isolation support a trial court's determination that there is a reasonable probability that a property would be put to its highest and best use. On the contrary, the court was entitled to consider the testimony of [the experts] in the context of all the evidence presented at trial relevant to the proposed use of the property." [Emphasis omitted.] ).
It is not purely speculative that someone other than the city would have used the assembled property for redevelopment. The DoNo proposal reflected its intention to effectuate such use. Its proposal expressed the view that north downtown was ripe for redevelopment. It bolstered that view with representations that it had secured letters of interest for the construction of a grocery store and a brewery in north downtown. The Mulready report prepared for the defendants confirmed that the construction of similar types of ballparks in other cities had sparked redevelopment. The fact that the trial court found the Mulready valuation too optimistic did not preclude its reliance on some of the subordinate facts on which that valuation was based. See State v. Andrews , 313 Conn. 266, 313, 96 A.3d 1199 (2014) ("[t]he trier of fact may credit part of a witness' testimony and reject other parts" [internal quotation marks omitted] ).
The record also does not reflect that it is purely speculative that only the city would have made such an assemblage. Yeatman testified that, from the outset of CBV's purchase of the property, he had viewed the property best used as assembled with adjoining properties for development. He undertook substantial measures **221 to eliminate every obstacle to assemblage. Although CBV's business plan indicated that the city was the most logical buyer to make this assemblage after the city purchased properties surrounding Parcel A, *419 that plan preceded the disclosure of the plan to construct the ballpark. Notably, once armed with the relevant information, Yeatman made clear that, even if he were to sell Parcel A to the city, he intended to develop Parcels B and C on his own. In addition, Yeatman testified that, if he had been given a fair opportunity, he "[a]bsolutely" would have responded to the city's request for proposals for all or part of the plan. Yeatman's failure to produce a specific plan for redevelopment can reasonably be explained by the short window of time between the disclosure of the ballpark plan and the taking of the property, and the failed negotiations during the intervening period.
Moreover, the record lends strong support to the trial court's findings that Yeatman had both the expertise and the means to assemble and develop the property himself. Over Yeatman's career as a real estate investor, he had made investments for clients totaling five and one-half billion dollars. He had developed large projects across the country similar in scale and type to DoNo's proposal. Yeatman had financed the property with mortgages to afford him the option of either selling the parcels to other developers or contributing the parcels to a joint venture and being a codeveloper of them. He testified that he had secured two other investors for development of the property.
In jurisdictions in which common ownership is not required, the fact that the city owned the properties that would need to be assembled with the defendants' property would not preclude a finding that assemblage by someone other than the city was reasonably probable. See Santa Clara v. Ogata , 240 Cal. App. 2d 262, 268, 49 Cal.Rptr. 397 (1966) ;
**222 Regents of the University of Minnesota v. Hibbing , 302 Minn. 481, 486-87, 225 N.W.2d 810 (1975) ; Clarmar Realty Co. v. Redevelopment Authority , 129 Wis.2d 81, 87-88, 383 N.W.2d 890 (1986) ; see also United Gas Pipe Line Co. v. Becnel , 417 So.2d 1198, 1202 (La. App.) ("[t]he fact that the adjacent land is held in ownership by another party who may or may not want to sell is not determinative" [internal quotation marks omitted] ) (quoting State v. Long , 344 So.2d 754, 759 [Ala. 1977] ), writ denied, 421 So.2d 1124 (La. 1982). As one court explained: "Were we to permit entities planning to acquire a block or other area of land to do so piecemeal by purchase or condemnation and thereby adversely affect the value of the remaining parcels by thwarting any reasonable possibilities for assemblage, we would be permitting these entities to acquire land by condemnation without justly compensating the owners. The fact that a condemnor acquires various parcels of land by direct purchase rather than by condemnation should make no difference because of the [ever present] threat of eminent domain." Regents of the University of Minnesota v. Hibbing , supra, at 486-87, 225 N.W.2d 810 ; see also Almota Farmers Elevator & Warehouse Co. v. United States , 409 U.S. 470, 480, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973) (Powell, J., concurring) ("[a]part from cases where ... the [g]overnment has a property interest antedating but within the bounds of its present project, it would be unjust to allow the [g]overnment to use 'salami tactics' to reduce the amount of one property owner's compensation by first acquiring an adjoining piece of property or another interest in the same property from another property owner" [citation omitted] ). The question is whether, despite the city's ownership of the adjoining properties, assemblage by the defendants or a third party for redevelopment was a reasonable probability sufficient to affect property values. See, e.g., Santa Clara v. Ogata , supra, at 268, 49 Cal.Rptr. 397 ; see also *420 Greystone Heights Redevelopment Corp. v. Nicholas Investment Co. , 500 S.W.2d 292, 296-98 (Mo. App. 1973). **223 We conclude that the record supports the trial court's conclusion that there was such a probability. The city had no intention of retaining the properties adjoining the defendants' property. The city's properties were not intended for use by the public (i.e., a bridge, road, or hospital) but, rather, for commercial and residential development by a private developer. In its responses to questions submitted regarding its request for proposals to accomplish those development goals, the city indicated that it would be willing to consider proposals for smaller redevelopment plans that did not include the ballpark.
We also cannot ignore the fact that the trial court supported its adoption of the Michaud assemblage valuation by the per square foot price paid by the city for the two properties abutting Parcel A. Although this factor was not an independent ground for the trial court's conclusion, it clearly bolstered that conclusion. It is noteworthy that common sense alone would suggest that Parcel A would be considerably more valuable than either of the two properties abutting it because Parcel A had substantially greater Main Street frontage, directly across the street from the ballpark site.
Finally, we recognize that, at the time of the taking, there was no certainty that the ballpark would be constructed and, if constructed, whether it would be sufficiently successful to spark the hoped for redevelopment of north downtown. However, for such integrated use to be reasonably probable in the absence of condemnation, the possibility of assemblage must only be "considerable enough to be a practical consideration and actually to influence prices." McGovern v. New York , 229 U.S. 363, 372, 33 S.Ct. 876, 57 L.Ed. 1228 (1913) ; accord Towpath , supra, 255 Conn. at 550, 767 A.2d 1169. The assemblage need not occur imminently, but only in the "reasonably near future ...."[11] (Internal quotation marks omitted.)
**224 Branford v. Santa Barbara , supra, 294 Conn. at 796, 988 A.2d 209. In light of the present record and the claims raised below, we do not have a definite and firm conviction that a mistake has been made in finding that assemblage for development was reasonably probable even in the absence of condemnation.
II
The city also claims that the trial court improperly awarded interest at the rate of 7.22 percent after it rendered judgment sustaining the defendants' appeal. According to the city, because the trial court did *421 not set an interest rate in the judgment of compensation, the defendants are entitled only to the default rate of interest provided in § 37-3c. The city further asserts that the defendants were not entitled to offer of compromise interest because, if the default rate of interest properly had been awarded, the total compensation would not have exceeded their offer of compromise. In response, the defendants characterize the award as "postjudgment" interest and contend that it would be absurd to expect them to litigate the proper rate of interest before the court has rendered judgment as to the fair value of the property. We agree with the city.
The following additional procedural history is relevant to this issue. The trial proceedings and all posttrial/prejudgment **225 filings focused exclusively on the fair market appraisals of the property. The defendants did not raise the issue or present evidence related to the rate of interest. The trial court rendered judgment in favor of the defendants on December 5, 2016, finding that the property was worth $2,830,000 more than the amount paid by the city at the time of the taking. The trial court's decision contained no reference to an award of interest.
On December 20, 2016, the defendants filed a motion for an award of interest on the $2,830,000 from the date of the taking in 2014, through the December 5, 2016 date of judgment, citing General Statutes § 37-3a. The city opposed the motion on the grounds that (1) interest recoverable in a condemnation action is governed by § 37-3c, not § 37-3a, the latter governing interest in civil actions generally as damages for the detention of money after it becomes payable, and (2) pursuant to the terms of § 37-3c, the defendants were entitled only to the default rate of interest prescribed therein because the trial court had failed to set an interest rate in its judgment. At a hearing on the motion, the defendants conceded that § 37-3c is the controlling statute for interest in condemnation cases. Nonetheless, they argued that the court could set interest at the 10 percent rate set forth in § 37-3a as a "reasonable and just" interest rate under § 37-3c. To avoid an evidentiary hearing, the parties subsequently stipulated that, if the trial court were to conclude that it could set a "reasonable and just" interest rate after judgment had entered, then such a rate would be 7.22 percent.
The trial court granted the defendants' motion for an award of interest, ordering payment of interest at a rate of 7.22 percent. As a result, the total compensation award, including interest, exceeded the defendants' offer of compromise, and they thereafter successfully **226 moved for offer of compromise interest in the amount of $457,202.22.[12]
The issue before us raises a question of statutory construction. As such, we apply plenary review guided by settled principles of construction aimed at ascertaining legislative intent. See generally General Statutes § 1-2z ; Lieberman v. Aronow , 319 Conn. 748, 756-57, 127 A.3d 970 (2015) ; In re Tyriq T. , 313 Conn. 99, 104-105, 96 A.3d 494 (2014).
The text of § 37-3c provides in relevant part: "The judgment of compensation for a taking of property by eminent domain shall include interest at a rate that is reasonable and just on the amount of the compensation awarded. If a court does not set a rate of interest on the amount of compensation awarded , the interest shall be calculated as follows ...." (Emphasis *422 added.) Section 37-3c then prescribes calculation methods premised on the "weekly average one-year constant maturity yield of United States Treasury securities ... for the calendar week preceding the date of taking," with additional interest awarded if the period from the date of the taking exceeds one year. Interest accrues from the date of the taking to the date of payment. General Statutes § 37-3c.
In our view, the statute unambiguously dictates that, when the "judgment of compensation" does not include a rate of interest, as in the present case, the default rate applies. There is simply no authority allowing the trial court to adopt another rate of interest. To conclude otherwise would render the second sentence of § 37-3c superfluous. See Lopa v. Brinker International, Inc. , 296 Conn. 426, 433, 994 A.2d 1265 (2010) ("[a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant"
**227 [internal quotation marks omitted] ). It appears that the legislature assumed that tying the default rate to the yield of variable securities would ensure a sufficiently reasonable and just rate.
The defendants make no argument that the statutory text reasonably can be read otherwise. Instead, they make various policy arguments as to why application of the default rule would yield absurd results. We are not persuaded.
The defendants' characterization of the interest at issue as "postjudgment interest" evidences a fundamental misunderstanding of the unique nature of the interest in a condemnation case. Although § 37-3c governs the rate of interest in condemnation cases, the right to the award of interest in such cases is constitutional, not statutory. Leverty & Hurley Co. v. Commissioner of Transportation , 192 Conn. 377, 380, 471 A.2d 958 (1984). As a consequence, "[a] landowner, if there is no fault for delay on his part, is entitled to interest to the date of payment as a proper element of damages for the taking ." (Emphasis added.) E. & F. Construction Co. v. Ives , 156 Conn. 416, 420-21, 242 A.2d 768 (1968) ; see id., at 420, 242 A.2d 768 ("[T]he fifth amendment [to the United States constitution] ... requires the states to pay just compensation for private property taken for public use.... [J]ust compensation includes an additional sum which is an amount sufficient to produce the full equivalent of that value paid contemporaneously with the taking." [Citations omitted; internal quotation marks omitted.] ).[13] Determining all components of compensation **228 for the taking at the time of judgment is essential so that a reviewing court can adequately determine whether the compensation is just.[14] See Laurel, Inc. v. Commissioner of Transportation , 180 Conn. 11, 46-48, 428 A.2d 789 (1980) (evaluating rate of interest in context of all components of award of compensation). Therefore, the equitable determination of *423 the rate of interest must be determined by the trial court at the time of the judgment of compensation. See, e.g., Leverty & Hurley Co. v. Commissioner of Transportation , supra, at 379, 471 A.2d 958 (committee of state trial referees determined that plaintiff landowner was entitled to additional sum of $199,400 with "interest at the legal rate from the date of taking to the date of payment" [internal quotation marks omitted] ).
We are not persuaded by the defendants' contention that condemnees must be able to seek interest postjudgment because it would be senseless to require a condemnee to present evidence regarding a reasonable and just rate of interest when the court has not yet found that the amount provided by the government at the time of the taking was inadequate.[15] The condemnee is free to seek bifurcation of the proceeding, first resolving the value of the property and then resolving the matter of a reasonable rate of interest. See Practice Book § 15-1 ; see also Barry v. Quality Steel Products, Inc ., 263 Conn. 424, 449, 820 A.2d 258 (2003) ("[b]ifurcation may be appropriate in cases in which litigation of one issue **229 may obviate the need to litigate another issue" [internal quotation marks omitted] ). In many cases, the rate of interest may be determined solely on the basis of documentary evidence and argument.
We also are not persuaded by the argument that if a trial court were to inadvertently fail to set a rate of interest at the time of judgment and thereby trigger the default statutory rate of interest, a condemnee would be without recourse. Our rules of practice permit a party, within four months of a judgment, to move to open the judgment when there is "a good and compelling reason for its modification or vacation." (Internal quotation marks omitted.) Mazziotti v. Allstate Ins. Co. , 240 Conn. 799, 809, 695 A.2d 1010 (1997) ; see Practice Book § 17-4 (a). Although the granting of a motion to open is within the discretion of the trial court; Mazziotti v. Allstate Ins. Co., supra, at 809, 695 A.2d 1010 ; inadvertent failure to determine the reasonable rate of interest after this matter has properly been presented to the trial court might well qualify as a good and compelling reason to modify a judgment.
We conclude that the trial court lacked authority to set a rate of interest other than the default rate after it rendered its judgment of compensation. Therefore, the trial court improperly awarded interest at the rate of 7.22 percent rather than the default rate dictated by § 37-3c. As a result, the trial court also improperly granted the defendants' motion for offer of compromise interest. See footnote 12 of this opinion.
The judgment is reversed only as to the rate of interest and offer of compromise interest and the case is remanded with direction to award the default rate of interest under § 37-3c ; the judgment is affirmed in all other respects.
In this opinion the other justices concurred.
APPENDIX
*424 --------

The defendants are CBV Parking Hartford, LLC, CBV Parking Hartford Ann, LLC, and CBV Parking Hartford Chapel, LLC. Although related entities, each defendant held title to one of three parcels comprising the property subject to the taking. Several other entities that had record interests in the property were named as defendants but are not parties to this appeal.

For ease of reference, a map included in one of the reports submitted by the valuation experts reflecting the boundaries of Parcels A, B and C is reproduced as an appendix to this opinion.

Yeatman testified that a gangway is "a pedestrian access point to allow pedestrians to get from one property to another."

Yeatman testified that the short deadline evidenced that the request for proposals was simply a "beauty contest," because the preparation necessary to complete the market studies and establish the financial bona fides for a proper submission could not reasonably have been completed in such a short period. The trial court found it unnecessary to make any findings as to whether Yeatman "had been treated fairly by the city."

As we explain in further detail in this opinion, the doctrine of assemblage permits a property owner to introduce evidence in a condemnation proceeding that the fair market value of its land is enhanced by its probable assemblage with other parcels, which in turn could permit a higher and better use. See Commissioner of Transportation v. Towpath Associates , 255 Conn. 529, 548-49, 767 A.2d 1169 (2001).

The city paid $1,280,000, equating to $25.75 per square foot, for the LAZ lot. The city paid $625,000 for the Ugly lot plus $600,000 to demolish the eyesore building on it, which, together, equated to a per square foot price of $42.37. According to one of the city's experts, the city was highly motivated to buy the Ugly lot because many city officials believed that the building was such a "blight" on the neighborhood that it had "stymied" development in that area. This view was consistent with the 2008 redevelopment plan's goal of removing "obsolete and blighted buildings from a critical perimeter area of the [d]owntown ...."

In the city's posttrial brief, it appears to have conceded that the value added by such plans could be considered if that value was not speculative: "The only relevance that the proposed baseball stadium has in this case is what impact, if any, did the information that was available [on the date of the taking] on December 9, 2014, regarding the proposed development have on the value of the subject property. While it is the stated goal of the [request for proposals] to catalyze development through the ballpark, the plan that was produced in response to that [request] is only conceptual and may not be developed."

See Almota Farmers Elevator & Warehouse Co. v. United States , 409 U.S. 470, 480, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973) (Powell, J., concurring) ("Where multiple properties or property interests are condemned for a particular public project, the [g]overnment must pay pre-existing market value for each. Neither the [g]overnment nor the condemnee may take advantage of an alteration in market value attributable to the project itself." [Emphasis omitted; internal quotation marks omitted.] ); Santa Clara Valley Transportation Authority v. Mission West Shoreline, LLC , Docket No. H030248, 2008 WL 1823068, *6 (Cal. App. April 24, 2008) ("[t]he fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following ... [a] [t]he project for which the property is taken ... [b] [t]he eminent domain proceeding in which the property is taken ... [c] [a]ny preliminary actions of the plaintiff relating to the taking of the property" [internal quotation marks omitted] ); Cole v. Boston Edison Co. , 338 Mass. 661, 666, 157 N.E.2d 209 (1959) (noting rule that, "if it was contemplated at the time of the original construction that the land in question would sooner or later be taken for the purposes of the project, the enhanced value is not to be used in determining damages" [emphasis omitted] ); Regents of the University of Minnesota v. Hibbing , 302 Minn. 481, 485, 225 N.W.2d 810 (1975) ("[n]either an owner nor a condemnor is permitted to gain by any increase or decrease in value of the land taken due to the impact upon land values generated by an area redevelopment project for which the tracts included are acquired" [internal quotation marks omitted] ); Fusegni v. Portsmouth Housing Authority , 114 N.H. 207, 209, 317 A.2d 580 (1974) (acknowledging rule that trier of fact is not entitled to consider any increase or enhancement in value of condemnee's property due to redevelopment project including condemnee's property); Cleveland v. Carcione , 118 Ohio App. 525, 531, 190 N.E.2d 52 (1963) ("[w]here one entire plan has been adopted for a public improvement, and from the inception a certain tract of land has been actually included therein, the owner of such tract in a condemnation proceeding therefor is not entitled to an increased value which may result from the improvement, where its appropriation is a condition precedent to the existence of the improvement" [internal quotation marks omitted] ); see also United States v. Fuller , 409 U.S. 488, 492, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) ("the general principle [is] that the [g]overnment as condemnor may not be required to compensate a condemnee for elements of value that the [g]overnment has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain"); West Haven v. Norback , 263 Conn. 155, 170, 819 A.2d 235 (2003) (concluding that referee's reference to anticipated development of surrounding properties was not improper because report did not establish that such development was necessary to determination of fair market value).
Relatedly, although DoNo's proposal set forth several conditions for its approximately $330 million investment, not the least of which were substantial infrastructure investments and financial concessions by the city, the city did not advance any argument before the trial court relating to these matters. Therefore, we similarly do not consider those factors.

We presume that the trial court and the parties took this approach because there is Appellate Court case law holding that "the better rule is not to impose an absolute requirement of common ownership for parcels sought to be assembled for valuation purposes." Franc v. Bethel Holding Co. , 73 Conn. App. 114, 122-23, 807 A.2d 519, cert. granted, 262 Conn. 923, 812 A.2d 864 (2002) (appeal withdrawn October 21, 2003).

The trial court's decision attributed this opinion to the "Michaud analysis." We presume that the court was referring to Michaud's testimony, which was the only source of such an opinion. The Michaud report did not express any opinion as to whether assemblage for redevelopment by someone other than the city was reasonably probable.

As one court explained: "The term 'in the near future' or even the term 'in a reasonable time' bear[s] no direct relationship to the ultimate subject under inquiry, i.e., the market value of the condemnee's land to the hypothetical willing buyer. To a literal-minded judge, the term 'near future' might exclude a rezoning that is unlikely for a two or three year period. To an astute investor, however, ten, fifteen or even twenty years might be considered 'in the near future,' or a 'reasonable time,' from the standpoint of investment objectives. One primary objective in a condemnation proceeding is to bring the values of the real-world marketplace into the courtroom. Yet a rule which commands a trial judge to exclude evidence of a rezoning which may take place beyond the judge's abstract notion of the 'near future' or a 'reasonable time' seems ... to frustrate that goal.
"The far better rule ... emphasizes the clause in the Nichols rule which states that '... such likelihood may be considered if the prospect of such (zoning change) ... is sufficiently likely as to have an appreciable influence upon present market value.' " Moschetti v. Tucson , 9 Ariz. App. 108, 112-13, 449 P.2d 945 (1969), overruled in part on other grounds by Tucson v. Rickles , 15 Ariz. App. 244, 246, 488 P.2d 180 (1971).

Had the default rate applied, the total compensation would not have exceeded the offer of compromise.

The defendants have never advanced an argument that the default rate of interest under § 37-3c is constitutionally inadequate. See E. & F. Construction Co. v. Ives , supra, 156 Conn. at 419-20, 242 A.2d 768 ("[a] statutory rule for compensation cannot be provided by the legislature which is less favorable than that required by constitutional mandate"). Accordingly, we have no occasion to consider the constitutional implications of application of the default rule. See Statewide Grievance Committee v. Whitney , 227 Conn. 829, 846, 633 A.2d 296 (1993) ("general rule against considering claims not raised at trial also applies to constitutional issues").

The defendants' addition of the amount of interest to the judgment of compensation as a basis to seek additional interest on the ground that the judgment exceeded the offer of compromise evidences that such interest is in fact an element of damages. They cannot have it both ways.

For similar reasons, we disagree with the defendants' assertion that the award of a rate of interest is akin to an award of attorney's fees because the final award cannot be calculated at the time of judgment. Although the final amount of interest cannot be determined until the judgment of compensation as to the property value has been determined and payment has been made, the rate of interest can be determined before the judgment of compensation is rendered.